# Exhibit 6

| | |
|---|---|
| **From:** | Ben-Jacob, Michael |
| **Sent:** | Saturday, April 23, 2011 9:32 PM |
| **To:** | Tuchman, Louis |
| **Subject:** | Fw: Document List |

Will you call him tomorrow to discuss?

I don't think I add any value to the conversation, but if you would like me on the call let me know.

Mbj

---

**From**: RICHARD MARKOWITZ <rmarkowitz@argremgt.com>
**To**: Wells, Peter; Ben-Jacob, Michael; Raj Shah <Raj.shah@solo-capital.com>; Guenther Grant-Klar <guenther.grant-klar@solo-capital.com>; Sanjay Shah <sanjay.shah@solo-capital.com>; Jas Bains <Jas.Bains@solo-capital.com>
**Cc**: Adam Larosa <alarosa@argremgt.com>; Veillette, Rebecca; Tuchman, Louis
**Sent**: Fri Apr 22 20:07:21 2011
**Subject**: Re: Document List

I think we may still have to talk through the definition of Final Exchange Amount, to account for:

(1) a potential loss on the sale of shares; and
(2) the potential costs (losses) on the hedging being done by Lyford.

With respect to (1), Solo has indicated that the potential loss on the sale of shares should be close to the net amount of the dividend received, so most trades may be flat, (taking into consideration the net dividend received). Gain on the overall trade occurs when and if the reclaims are received. Using the following example,

Buy stock        100 mm
Sell Stock       99 mm
Net dividend     750,000

Assuming no reclaim and no other hedging costs to Lyford in the futures account, the investors would calculate a relatively small loss on the transaction of 250,000. However, the definition of Final Price seems to result in a calculation of an amount equal to 750,000, because clause (i) of the definition only considers a gain on sale ("excess"). The Final Exchange Amount would be 750,000 – 650,000 or 100,000, which we know can't be because there is not 100,000 of profit in the Charity's account. In fact, the swap terms would require the charity to return the Replacement Cash (net of only fees and expenses) plus make this Final Exchange Amount payment of 100,000. We would have thought the numbers should work so that the loss of 250,000 is actually a payment owed by us to the Charity and which the Charity would be net against its obligation to return the Replacement Cash (net of fees and expenses) so that the loss of 250,000 is felt by the Investors.

It would seem that the definition works only when you sell for an amount greater then or equal then the purchase price. I think this fix is needed for the Charity's benefit. I'm not sure I can think of a way the investors are harmed. The fix may be that we need to define Final Price as the sum of (i) the difference between the net cash proceeds received and the purchase price; (ii) any Reclaims; and (iii) the net dividends received. If such amount is negative, the amount is owed to the Charity by the Investor and the netting provisions of the swap should cause the Charity's repayment obligation under section 3(d) to be reduced. I also believe that with this change, we should bring all of the fees and expenses into the definition/calculation of Final Price, rather then in section 3(d).

1

DEFENDANTS'
EXHIBIT
DX3187
Case No:18-MD-2865 (LAK)

CONFIDENTIAL / PRIVILEGED – SUBJECT TO 502(d) ORDER    WH_MDL_00364011
DX3187, page 1 of 5

Additionally, if we make this change I think we can eliminate the need to have a defined term "Fixed Payment". We just need to say that the Investor owes the Final Payment to the Charity whenever the Final Payment is 650,000 or less; and the Charity owes the Investor the Final Payment whenever the Final Payment is greater then 650,000. (Although point (2) below will need to expand on this.) I think the result of this is for the Charity to get the first 650,000 of gains, from which Solo would get 20%. We just need to make sure that the IMA looks at net payments under the swap (after taking into account the Charity's repayment obligation under Section 3(d).

With respect to (2), even using the current definitions or the new formulation I propose, lets assume that all of the Purchases and Sales result in zero gain or loss, but the Charity has received 10 mm of Net Dividends (assume further, there are no Reclaims). The swap definition would have the Charity pay 9.35 mm to the Investor (after taking its 650,000 Fixed Amount). There will likely have been losses on all of the Futures trades that were in excess of 10 mm and this should be a case were the Charity is not owed its Fixed Amount. (Again, we are assuming no Reclaims, so we know that the Investors will be losing money due to fees, expenses and trading losses all around).

A fix here is needed for the Investors, since the overall economics of the trade are now to be found in by combining the results of the Charity's trades in the shares, on the one hand, and Lyford trades in the futures contracts, on the other. The losses, if any, will be directly for the account of Lyford and will reduce the money they have invested into Solo's account. After thinking this one through, I am not sure there is an easy and elegant fix to be had in the swap itself. We are really talking about including the calculations of Hedging Costs back into the definition of Final Price, BUT ONLY IN THE CASE WHEN FINAL PRICE WOULD HAVE BEEN GREATER THEN ZERO WITHOUT THEIR INCLUSION. When the Final Price is already less then zero, we can't have additional losses (already incurred by the Investor in the MF Global account) be used by the Charity to reduce it repayment obligation under Section 3(d). Maybe a side letter would be better then bringing the futures activities of Lyford into the swap.

I realize, after typing all of this, that this is pretty dense and I could also be misunderstanding the provisions drafted in the swap. If so, I apologize.

Rich


On 4/22/11 4:33 PM, "Peter Wells" <peter.wells@kayescholer.com> wrote:

> Dear All,
>
> Further to Michael's email below , attached to this email are the following documents:
>
> 1.   Notional Principal Contract – between Lyford and Ezra Academy
>
> 2.   Investment Management Agreement – between Ezra Academy and Solo
>
> 3.   Letter Agreement regarding investment advisory fees – between Lyford and Sanjay
>
> 4.   Indemnification Agreement with Ezra Academy (this document was previously circulated and has been signed by all parties but we have yet to receive a copy signed by Solo)
>
> 5.   Supplement to the Indemnification Agreement
>
> 6.   Resolution of Solo - with respect to the accounts

CONFIDENTIAL / PRIVILEGED – SUBJECT TO 502(d) ORDER       WH_MDL_00364012
DX3187, page 2 of 5

7.   Nominee Agreement – between Lyford and Solo

8.   Personal Indemnification by Sanjay Shah – between Sanjay Shah and Lyford

Let me know if there are any questions.

Regards,
Peter


**From:** Ben-Jacob, Michael
**Sent:** Friday, April 22, 2011 1:48 PM
**To:** 'RICHARD MARKOWITZ'; Raj Shah; Guenther Grant-Klar; Sanjay Shah; Jas Bains
**Cc:** Adam Larosa; Veillette, Rebecca; Wells, Peter; Tuchman, Louis
**Subject:** Document List

All,

Further to our conversation a moment ago, the following is a list of the documents that we are preparing and expect to circulate shortly:

1.   <u>Notional Principal Contract (swap)</u> – between Lyford and Ezra Academy

2.   <u>Investment Management Agreement</u> – between Ezra Academy and Solo

3.   <u>Letter Agreement</u> – between Lyford and Sanjay Shah regarding investment advisory fees to be paid by Lyford to Sanjay

4.   <u>Indemnification Agreement</u> – indemnifying Ezra Academy in respect of all claims or proceedings which may arise as a result of the transaction (this document was previously approved and executed by all parties but we have not received the executed document from Solo)

5.   <u>Supplement to Indemnification Agreement</u> --  whereby all parties (except Solo) indemnify Ezra Academy for any investment management fees due to Solo under the investment management agreement and all parties (including Solo) indemnify Ezra Academy in respect of any costs/liabilities incurred via trading within the DB account if, for example, there is a fee imposed if the transaction doesn't go forward or if a trade order is placed and later cancelled, etc.

6.   <u>Resolution of Solo</u> – whereby Solo determines to appoint me as sole signatory over the Solo MF Global and Solo HSBC accounts and coordinate with MF Global and HSBC to institute the safeguards set forth in the resolution

7.   <u>Nominee Agreement</u> – between Lyford and Solo whereby Lyford appoints Solo as its nominee to conduct trades within the Solo MF Global and HSBC accounts on behalf of Lyford and which appoints me as agent on behalf of Lyford to be sole signatory over such accounts on behalf of Lyford

8.   <u>Personal Indemnification by Sanjay Shah</u> – whereby Sanjay provides a personal indemnification for any damage, cost, expense, etc. resulting from any action taken by Solo, himself, Guenther, Raj, Jas or any other officer, director, agent, assignee, etc. of Solo

3

**CONFIDENTIAL / PRIVILEGED – SUBJECT TO 502(d) ORDER**    WH_MDL_00364013

inconsistent with the above referenced Resolution and Nominee Agreement.

In addition to the foregoing, I note the following:

1.    We may still need a Notional Principal Contract between Solo and Ezra Academy.

2.    The account documents for a Lyford MF Global account have been completed and I have confirmation from Susan Demers that we will have the execute pages back to us by 5pm today, which we will forward once received.

3.    We await further word regarding any documents needed for a Lyford HSBC Euro account.

Please let me know if there is anything that needs to be added.

Regards.

mbj

Michael Ben-Jacob
Kaye Scholer LLP
425 Park Avenue
New York, New York, 10022
Phone: 212-836-8310
Fax: 212-836-6310
email: michael.ben-jacob@kayescholer.com

**From:** RICHARD MARKOWITZ [mailto:rmarkowitz@argremgt.com]
**Sent:** Friday, April 22, 2011 9:25 AM
**To:** Raj Shah; Guenther Grant-Klar; Sanjay Shah; Jas Bains
**Cc:** Adam Larosa; Ben-Jacob, Michael; Veillette, Rebecca; Wells, Peter; Tuchman, Louis
**Subject:** DB Requests

I think you may alrady have received it (as part of whay was sent to JPMorgan last week).

Here is some threads of email traffic this morning. Please let us know on our call if you still can't find it. (Most of us are out of our offices, as is Susan Demers, so we are mostly trying to look at old emails we sent you.

FROM SUSAN…

**We sent a DD package to you for Lyford last week. The way it works is that Vicali is the director (see register of directors and Certificate of Incumbency) and therefore the authorised signatories of Vicali (you have an original signatory list) sign for Lyford. That is me Andrea and Bill and you have complete DD on all of us (passports, driver's licenses and utility bills).**

4

DX3187, page 4 of 5

I will also forward you an email that may have the document you need.

--

Richard Markowitz
Managing Director
Argre Management LLC
40 West 57th Street
New York, NY 10019

Email:    Rmarkowitz@Argremgt.com
Tel:      (212) 247-2600
Fax:      (212) 247-2753
Mobile:   (917) 848-5675

5

CONFIDENTIAL / PRIVILEGED – SUBJECT TO 502(d) ORDER

WH_MDL_00364015

DX3187, page 5 of 5